IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CALZONE KING, LLC, | |
| Plaintiff, | **8:24CV335** |
| vs. | |
| MIDWEST DOUGH GUYS, LLC, NICKOLAS ROWAN, and CORY ROWAN, | **MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

In this case, the franchisor of the only national calzone restaurant franchise seeks an *ex parte* temporary restraining order (TRO) prohibiting terminated franchisees from operating a competing business in the same location as the franchised business in violation of non-compete provisions of the applicable franchise agreements and from using the service mark of the franchise. Filing 1 at 2 (¶ 14); Filing 4 at 1 (¶¶ 1–2). The Court has given the franchisor's Motion for Temporary Restraining Order, Filing 4, expedited consideration, and for the reasons stated below, the Court grants the Motion and issues an *Ex Parte* Temporary Restraining Order, although more limited in scope than the franchisor requested.

## I.  INTRODUCTION

### A.  Factual Background

The Court begins its explanation of the reasons for its ruling with a statement of the factual background drawn from the plaintiff's Verified Complaint. Filing 1. The Court hastens to add that findings of fact in a ruling on a motion for a TRO or a preliminary injunction are necessarily

"preliminary" or "provisional" and are not binding in subsequent proceedings.[1] This is particularly so when the TRO is *ex parte*, because the defendants have not had a chance to challenge the plaintiff's allegations.

### 1. The Parties

Plaintiff Calzone King, LLC, is a New York limited liability company with its principal place of business in New York. Filing 1 at 1 (¶ 1).[2] Calzone King is the franchisor of D.P. Dough franchises, which is the only national calzone restaurant franchise. Filing 1 at 2 (¶¶ 14, 17). Calzone King has obtained the exclusive right from D.P. Dough Franchising, LLC, to license to franchisees the use of D.P. Dough Franchising's federally registered service mark "D.P. Dough." Filing 1 at 2 (¶¶ 15–16). Calzone King's business model includes locating D.P. Dough restaurants near college campuses and offering late-night food delivery primarily marketed to local student populations. Filing 1 at 2 (¶ 18). Calzone King provides its franchisees with access to The Calzone King System (the System), which Calzone King alleges "is a unique style of restaurant operation for the sale of food products and beverages of uniform quality." Filing 1 at 2 (¶ 19).

Defendants Nickolas Rowan a/k/a Nickolas Seevers (Seevers) and Cory Rowan (Rowan) are both residents and citizens of the State of Nebraska. Filing 1 at 1 (¶¶ 3–5). Seevers and Rowan are believed to be the sole members of Defendant Midwest Dough Guys, LLC, a Nebraska limited liability company with its principal place of business in Nebraska. Filing 1 at 1–2 (¶¶ 6–8).

---

[1] *See U.S. Sec. & Exch. Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.'" (quoting *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985))); *Campaign for Fam. Farms v. Glickman*, 200 F.3d 1180, 1186 (8th Cir. 2000) ("[T]he district court's findings of fact and conclusions of law on an application for a preliminary injunction are 'tentative and provisional, in the sense that different findings . . . might be warranted after a trial on the merits.'" (quoting *Independent Fed. of Flight Attendants v. Trans World Airlines, Inc.*, 655 F.2d 155, 159 (8th Cir. 1981), and also citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981))).

[2] Calzone King alleges that none of the members of Calzone King are residents or citizens of the State of Nebraska.

2.   *The Franchise Agreements*

On February 9, 2020, August 10, 2020, and October 28, 2020, Calzone King entered into Franchise Agreements with Midwest Dough Guys granting Midwest Dough Guys the right to operate a D.P. Dough restaurant within 1.5 miles of the University of Nebraska in Lincoln, Nebraska, the Kansas State University in Manhattan, Kansas, and the University of Nebraska at Kearney, in Kearney, Nebraska, respectively. Filing 1 at 2–3 (¶¶ 20, 22, 24). The Franchise Agreements are attached to Calzone King's Complaint. Filing 1-1; Filing 1-2; Filing 1-3. In Attachment C to each of the Franchise Agreements, Seevers and Rowan personally guaranteed performance of the Franchise Agreements. Filing 1 at 3 (¶ 28). Each of the Franchise Agreements contains a choice of law provision that provides that Ohio law governs the terms of the Franchise Agreements. Filing 1 at 3 (¶ 29).

Each of the Franchise Agreements required Midwest Dough Guys to pay Calzone King a minimum weekly royalty of $150 per week (the Minimum Royalty Payments). Filing 1 at 6 (¶ 39). Calzone King alleges, "The Franchise Agreements granted Midwest Dough Guys an exclusive territory of operation by providing that Calzone King will not establish, operate, or enfranchise any other D.P. Dough restaurant within a five-mile radius of Midwest Dough Guys's [sic] locations." Filing 1 at 3 (¶ 27). At the same time, in consideration for receiving a D.P. Dough franchise, Defendants agreed to a non-compete provision in Section 14 of each of the Franchise Agreements (the Non-Compete Provision), which provides as follows:

> **A.**  Franchisee shall not, without the prior written consent of Calzone King, directly or indirectly (each of the following obligations is also secured by the Personal Guaranty, if applicable, as attached as Attachment C and fully incorporated herein):
>
> **i.**  During the term of this Agreement, (a) engage in any activity in competition with the System, including, but not limited to, involvement, whether

3

as an owner, officer, director, employee, lender, or otherwise, of any business engaged in the sale of calzones, pizza, or any business that customarily has operating hours past midnight and offers delivery services (collectively, a "Competing Restaurant"), other than at the Restaurant, or (b) employ any person or furnish or permit any person who is engaged or who has arranged to become engaged in any activity in competition with the System, including, but not limited to, involvement, either as an owner, officer, director, employee, lender, or otherwise, of any Competing Restaurant;

  **ii.** For a period of three (3) years following the expiration, termination, or transfer of this Agreement, regardless of the cause of such expiration, termination or transfer, engage in the operation of a Competing Restaurant within sixty (60) miles of (a) the Restaurant, (b) any D.P. Dough Restaurant (including both D.P. Dough Restaurants that are currently open and any new D.P. Dough Restaurant that may open in the future, even if the opening of such D.P. Dough Restaurant is after Franchisee first opened a Competing Restaurant in the market), or (c) any College or University with an undergraduate population of eight thousand (8,000) students or more.

  **iii.** During the term of this Agreement and for a period of three (3) years after its expiration, termination, or transfer, regardless of the cause of such expiration, termination, or transfer, divert or attempt to divert any business or customer from any D.P. Dough restaurant.

  **iv.** During the term of this Agreement and for a period of three (3) years after its expiration, termination, or transfer, regardless of the cause of such expiration, termination, or transfer, employ or seek to employ any person who within the immediately preceding year was employed by any D.P. Dough restaurant or with Calzone King. If Franchisee is not an individual, then the owners, shareholders, partners, or members of Franchisee shall be bound by this Section, and shall sign the guaranty attached hereto as Attachment C.

  **v.** Franchisee acknowledges that under the terms set out above, Calzone King is entitled to a period of three (3) years immediately following the termination of the Agreement during which Franchisee will not violate the covenants set forth in this Paragraph 14(A) above. Franchisee agrees that if Franchisee breaches any such obligation to Calzone King during the three (3) year period immediately following termination of the Agreement, then the time period of the restrictive covenants shall be extended for the length of time that Franchisee fails to fulfill its obligations. This tolling provision shall not limit Calzone King right to other legal or equitable relief.

4

*See, e.g.*, Filing 1-1 at 13. Calzone King alleges that the University of Nebraska at Lincoln and the Kansas State University each have an undergraduate population of 8,000 or more students. Filing 1 at 6 (¶ 38).

Section 16 of each Franchise Agreement states in pertinent part the following terms regarding "Default and Termination":

> **A.** Franchisee shall be in default under this Agreement upon the occurrence of any of the following:
>
> **i.** Any breach of any of the terms of this Agreement by Franchisee or any guarantor; provided, however, that if such breach is not expressly listed under any other provision in this Section 16 that Calzone King shall first charge a Brand Standards Fee to Franchisee and provide Franchisee with notice and an opportunity to cure as set forth in Section 2(C) of this Agreement;
>
> * * *
>
> **vii**. The insolvency of Franchisee, the commencement of any proceedings under any federal bankruptcy or state insolvency law, the assignment of assets for the benefit of creditors, or the appointment of a receiver, trustee or similar person to oversee the business affairs of the Franchisee or any of its assets;
>
> * * *
>
> **B.** Calzone King may terminate this Agreement immediately upon written notice to Franchisee, without an opportunity to cure, following any of the following defaults by Franchisee:
>
> i. The abandonment of the Franchise by Franchisee, which shall be deemed to have occurred if Franchisee fails to operate the Restaurant for any consecutive three day period during which it is required to operate the Restaurant under the terms of this Agreement, or a combination of any five days (regardless of whether the days are consecutive) during a calendar year that it was required to operate the Restaurant. The failure to operate the Restaurant due to fire, flood, earthquake, or similar cause beyond Franchisee's control shall not be deemed abandonment of the Restaurant, nor shall the failure to operate the Restaurant during any holiday recognized by the federal government be deemed abandonment.

*See, e.g.*, Filing 1-1 at 16–17.

### 3. Defendants' Operation of D.P. Dough Restaurants

After executing the Franchise Agreements, Midwest Dough Guys operated D.P. Dough Restaurants at the following locations: 1442 O Street in Lincoln, Nebraska; 105 West 11th Street in Kearney, Nebraska; and 1120 Moro Street in Manhattan, Kansas. Filing 1 at 4 (¶¶ 30–32). Calzone King alleges that the gross sales of products or services between Calzone King and Midwest Dough Guys covered by the Franchise Agreements have exceeded $35,000 for the twelve (12) months next preceding the filing of this lawsuit. Filing 1 at 4 (¶ 33). Calzone King alleges further that more than twenty percent (20%) of Midwest Dough Guys' gross sales are intended to be or are derived from the Franchise Agreements. Filing 1 at 4 (¶ 34).

Calzone King alleges that breaches of the Franchise Agreements led it to terminate the Franchise Agreements by a letter dated August 9, 2024 (the Termination Notice). Filing 1 at 8 (¶ 54); *see also* Filing 1-4 (Termination Notice). The breaches consisted of Midwest Dough Guys filing a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Nebraska on August 15, 2023, and after that petition was dismissed on November 28, 2023, filing a second Chapter 11 bankruptcy petition in the same court, which was also dismissed on June 25, 2024. Filing 1 at 6–7 (¶¶ 42–51). Calzone King alleges that the bankruptcies demonstrate Midwest Dough Guys' insolvency and constituted acts of default under the Franchise Agreements. Filing 1 at 7 (¶ 46); Filing 8 (¶ 52). Midwest Dough Guys have ceased operating their Lincoln, Kearney, and Manhattan D.P. Dough restaurants, which is an act of abandonment under the Franchise Agreements. Filing 1 at 8 (¶ 53).

Calzone King alleges that as a direct and proximate result of Midwest Dough Guys' breaches, it has suffered and will suffer damages through the loss of the $150 per week minimum royalty for the remainder of the term of the Franchise Agreements. Filing 1 at 8 (¶ 56). Calzone

6

King alleges that the losses relating to the Lincoln Franchise agreement are $43,200 ($150 x 288 weeks); the losses relating to the Kearney Franchise are $50,250 ($150 x 335 weeks); and those relating to the Manhattan Franchise are $47,100 ($150 x 314 weeks). Filing 1 at 8 (¶ 56(a)–(c)).

### 4. Defendants Operation of a Competing Business in Lincoln

Calzone King alleges that on November 20, 2023, Seevers represented to the Lincoln City Council in connection with an application for a Class CK Liquor license as the owner of Silverado Sales, Inc., d/b/a Misfits, "We also own another restaurant here in Lincoln, DP Dough." Filing 1 at 8–9 (¶ 58) (citing meeting minutes (Filing 1-5)), (¶ 59) (citing a publicly available meeting video https://www.youtube.com/watch?v=esNSvp2CTxI&list=PLj13AfdUD7Y9k1KQ6ABREcSPXh5p4Ma4y&index=38&t=1760s). Calzone King alleges that after Defendants received the Termination Notice concerning the D.P. Dough Franchise Agreement, "Defendants rebranded the Lincoln [D.P. Dough] Restaurant as 'Misfits On O' or 'Misfits Calzones on O Street' and are currently selling calzones out of 1442 O Street, in Lincoln, Nebraska—the same location out of which Defendants operated their D.P. Dough franchise." Filing 9 at 62. As evidence that Defendants are doing so, Calzone King included in its Complaint posts that appeared on the Misfits on O Facebook page as of August 25, 2024. Filing 1 at 9–13 (¶ 63).

Calzone King also alleges that, on the Misfits on O Facebook page, "Defendants continue to have a post from July 24, 2020, before the termination [of the Franchise Agreement], that falsely associates their calzones for sale at Misfits on O with D.P. Dough by wrongfully using D.P. Dough's service mark which is likely to cause confusion in the market." Filing 1 at 13 (¶ 64). The Verified Complaint includes a screen shot of the Misfits on O Facebook page advertising calzones with the D.P. Dough service mark shown in the upper left corner. Filing 1 at 14 (¶ 64). Calzone King alleges further that "[a]s of August 26, 2024, the Misfits on O Facebook page had a section

called 'Misfits on O's Photos' which had more than twenty photos that display the D.P. Dough service mark." Filing 1 at 14–15 (¶ 65) (including a screen shot of the photos). Calzone King alleges that the Misfits on O Facebook page has more than 2,000 followers and is likely to cause consumer confusion that Misfits on O is associated with D.P. Dough. Filing 1 at 15 (¶ 66). Calzone King alleges on information and belief that Defendants operate Misfits on O using the same equipment that a Calzone King affiliate sold to Midwest Dough Guys; employing persons who at some point between August 9, 2023, and August 9, 2024, were employed by the Lincoln D.P. Dough restaurant; and using the recipes Defendants learned from the Calzone King System when making calzones under the Misfits on O brand. Filing 1 at 15–16 (¶¶ 67, 69–70).

### B. Procedural Background

Calzone King filed its Verified Complaint in this matter on August 27, 2024, against Seevers, Rowan, and Midwest Dough Guys. Filing 1 at 1 (¶¶ 3–6). Calzone King asserts both diversity subject-matter jurisdiction under 28 U.S.C. § 1332, and federal question subject-matter jurisdiction under 28 U.S.C. § 1331. Filing 1 at 2 (¶¶ 11–12). In the Verified Complaint, Calzone King asserts three claims for breach of the three Franchise Agreements. Filing 1 at 16–17. Calzone King's fourth claim is for unfair competition pursuant to 15 U.S.C. § 1125(a). Filing 1 at 17–18. The essence of this claim is the allegation that "Defendants' unauthorized use in commerce of the D.P. Dough service mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' products, and is likely to cause consumers to believe, contrary to fact, that Defendants' products are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendants are in some way affiliated with or sponsored by Plaintiff." Filing 1 at 17 (¶ 91). Calzone King seeks a temporary restraining order, preliminary injunction, and permanent injunction *inter alia* prohibiting Defendants from using D.P. Dough's service mark,

8

from conduct in violation of the Non-Compete Provisions of the Franchise Agreements and enforcing the terms of the Non-Compete Provisions of the Franchise Agreement. Filing 1 at 17–18 (Prayer, ¶¶ 1–5). Calzone King also seeks damages in excess of $75,000, court costs, reasonable attorney's fees, and any other relief the Court deems just and equitable. Filing 1 at 18 (Prayer, ¶¶ 6–8).

On August 27, 2024, Calzone King also filed the Motion for Temporary Restraining Order now before the Court seeking temporary restraint of Defendants consistent with the relief sought in the Verified Complaint. Filing 4. Calzone King certifies that on August 27, 2024, its counsel emailed a file-stamped copy of the Verified Complaint and a draft of the Motion for Temporary Restraining Order to Defendants' last known email address and notified them that Calzone King intended to file the Motion for Temporary Restraining Order. Filing 4 at 2 (Certification). In its Motion, Calzone King asserts, "No further notice is required prior to the entry of a TRO due to Defendants' clear violation of the Franchise Agreements and continued unlawful use of the D.P. Dough service mark in violation of the Lanham Act." Filing 4 at 2 (Certification). In its supporting brief, Calzone King sets out the requirements for the Court "to issue a temporary restraining order without written or oral notice to the adverse party or its attorneys." Filing 5 at 4. There is no other indication on the docket that Defendants have been served with either the Verified Complaint or the Motion. Although the caption of the Motion includes "Request for Expedited Hearing," there is no request in it for a hearing prior to issuance of the temporary restraining order. *See* Filing 4. The supporting brief likewise contains no request for a hearing prior to the issuance of the temporary restraining order and mentions a hearing only in relation to the limited duration of a TRO "until a preliminary injunction hearing can be held" as a ground for a minimal security. Filing

5 at 19. Thus, the Court concludes that Calzone King seeks an *ex parte* Temporary Restraining Order.

## II.  LEGAL ANALYSIS

### A.  Temporary Restraining Order Standards

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney." Fed. R. Civ. P. 65(b)(1). Rule 65(b) imposes significant requirements for a TRO issued without notice. Fed. R. Civ. P. 65(b)(1)–(3); *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (noting that there is a material difference between a TRO and a preliminary injunction in the allowed duration and the requirement of notice). The Court finds that Calzone King has submitted "a verified complaint." Fed. R. Civ. P. 65(b)(1)(A). The Complaint bears the verification of the president of Calzone King pursuant to 28 U.S.C. § 1746 and under penalty of perjury "that the factual allegations in the attached complaint are true and correct as [he] verily believe[s]." Filing 1 at 21 (Verification). The Verified Complaint also states "specific facts . . . clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Calzone King's attorney has also "certifie[d] in writing any efforts made to give notice and the reasons why it should not be required." *See* Fed. R. Civ. P. 65(b)(1)(B); *see also* Filing 4 at 2 (Certification). Consequently, the Court has not required additional notice to the Defendants, any response from them, or a hearing before the Court rules on the Motion for Temporary Restraining Order. Fed. R. Civ. P. 65(b)(1). Moreover, even if the Court orders that a TRO issue in this instance, any TRO would be subject to the durational limits of Rule 65(b)(2). Fed. R. Civ. P. 65(b)(2) (a temporary restraining order issued without notice "expires at the time after entry—not to exceed 14 days—that the court

10

sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension"). Thus, the lack of additional notice or a response from Defendants is not an impediment to issuance of a TRO in this case.

Rule 65(b) does not identify the standards that the Court must apply in deciding whether to grant a request for a TRO. *See generally* Fed. R. Civ. P. 65(b). However, the Eighth Circuit Court of Appeals has filled the gap by explaining that "the standard for analyzing a motion for a temporary restraining order is the same as [the standard for] a motion for a preliminary injunction." *Tumey*, 27 F.4th at 665. Thus, to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey*, 27 F.4th at 664 (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc*., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Wilbur-Ellis Co., LLC v. Erikson*, 103 F.4th 1352, 1355 (8th Cir. 2024) ("The court considers four factors when reviewing a district court's grant of a preliminary injunction: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest.'" (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013), in turn quoting *Dataphase Sys*., 640 F.2d at 113)).[3] No single factor is

---

[3] Courts in this Circuit have for decades called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc*., 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent factors by the Supreme Court in *Winter*, as quoted in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), *with Dataphase*, 640 F.2d at 114 (as quoted in *Wilbur-Ellis Co*. as set out in the body of this

11

determinative or dispositive. *Wilber-Ellis Co.*, 103 F.4th at 1356; *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024). Thus, "the court should balance all the factors in considering whether the injunction should be granted." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023).

The pertinent factors must be considered in the context of certain over-arching principles. First, "[a] preliminary injunction [or TRO] is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. 7, 24 (2008); *Cigna Corp.*, 103 F.4th at 1342 (quoting *Winter*, 555 U.S. at 24); *Tumey*, 27 F.4th at 665. Because it is an extraordinary remedy, "the party seeking a preliminary injunction bears the burden of establishing the necessity of the remedy." *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009)), *cert. denied*, 144 S. Ct. 1350 (2024)). Second, the "primary function" of a TRO or preliminary injunction "is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Cigna Corp.*, 103 F.4th at 1342 (quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)); *Wilbur-Ellis Co.*, 103 F.4th at 1355 ("The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." (quoting *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789–90 (8th Cir. 1989), in turn quoting *Ferry-Morse Seed Co.*, 729 F.2d at 593)). To put it another way, the purpose of preliminary injunctive relief "is not to give the movant the ultimate relief he seeks." *Lindell*, 82 F.4th at 618. Indeed, "[r]equiring [the defendant] to take affirmative action . . . before

---

decision). However, even since *Winter*, the Eighth Circuit Court of Appeals has generally persisted in relying on the pertinent factors from *Dataphase*. *See, e.g., Wilbur-Ellis Co.*, 103 F.4th at 1356–57; *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023); *but see Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342–1343 (8th Cir. 2024) (quoting the factors from *Winter*, 555 U.S. at 20, then citing *Dataphase Sys.*, 640 F.2d at 114, for the "same factors," and referring to the "*Winter/Dataphase* factors").

12

th[e] issue has been decided on the merits goes beyond the purpose of a preliminary injunction." *Tumey*, 27 F.4th at 665 (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993)).

The Court turns to consideration of the *Winter/Dataphase* factors in this case in the context of these guiding principles.

### B. Likelihood of Success on the Merits

"While no single factor is determinative, the probability of success factor is the most significant." *Wilbur-Ellis Co.*, 103 F.4th at 1355 (internal quotation marks omitted); *Tumey*, 27 F.4th at 665. Thus, the movant's likelihood of success must be properly determined and then weighed against the other relevant factors. *Wilbur-Ellis Co.*, 103 F.4th at 1357. The Court begins its consideration of this factor with a summary of Calzone King's arguments.

#### 1. *Calzone King's Arguments*

Calzone King argues that it is likely to succeed on its claims of breach of the Franchise Agreements because Defendants began operating a competing calzone restaurant under a new name out of the same Lincoln location where they previously operated their D.P. Dough franchise. Filing 5 at 10. This restaurant is within 60 miles a college or university with an undergraduate population of 8,000 or more students, it sells calzones and pizza, it customarily has operating hours past midnight, and it offers delivery service, in violation of the non-compete provision of the Franchise Agreement, § 14.A.ii. Filing 5 at 14–15. As to the unfair competition claim, Calzone King argues that the Misfits on O Facebook page clearly shows that Defendants are continuing use of the D.P. Dough service mark and that such use is likely to cause consumer confusion. Filing 5 at 15.

### 2. Requirements to Show Likelihood of Success

The "likelihood of success" factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). Still more specifically, "[a] movant shows a likelihood of success on the merits when it demonstrates a 'fair chance,' not necessarily 'greater than fifty percent,' that it will ultimately prevail under applicable law." *Cigna Corp.,* 103 F.4th at 1343 (quoting *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)).

### 3. Calzone King Is Likely to Succeed on its Claims of Breach of the Franchise Agreements

Under Ohio law, which is controlling here, *see* Filing 1 at 3 (¶ 29), non-compete provisions in franchise agreements are enforceable by injunctive relief. *See Gimex Properties Corp. v. Reed*, 2022-Ohio-4771, ¶ 73, 205 N.E.3d 1, 17–18; *ITS Financial, L.L.C. v. Gebre*, 2d Dist. Montgomery Nos. 25416, 2014-Ohio-2205, 2014 WL 2169606, ¶ 26. A franchise agreement is interpreted like any other written contract. *Convenient Food Mart, Inc. v. Con. Inc.*, No. 95-L-093, 1996 WL 635848, at *3 (Ohio Ct. App. Sept. 30, 1996) (stating in the context of a claim that the trial court erred in failing to enforce the non-compete provision of a franchise agreement that "[t]he interpretation of a written contract is a matter of law for the court."). Thus,

> The court is to interpret the contract to carry out the intent of the parties. *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, paragraph one of the syllabus. The intent of the parties is presumed to reside in the language employed in the agreement. *Kelly v. Medical Life Ins. Co.* (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. Common words appearing in the agreement will be given their plain and ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall contents of the contract. *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638. Where there is no ambiguity in the terms employed in the contract, courts are not to create a new contract by finding an intent not expressed therein. *Id.*

14

*Convenient Food Mart, Inc.*, 1996 WL 635848, at *3. Finally, to establish breach of a contract, such as a franchise agreement, "a party must establish the existence of an agreement, that the non-breaching party fulfilled its obligations under the agreement; a breach without legal justification; and damages to the non-breaching party." *Simecek v. Simecek*, 2024-Ohio-2471, ¶ 16 (internal quotation marks and citations omitted).

Here the Verified Complaint shows the existence of a non-compete provision in the Franchise Agreements that the Defendants entered into and guaranteed. *Id.* (first element). There is no evidence at this preliminary stage that Calzone King did not fulfill its obligations under the Franchise Agreements. *Id.* (second element). The Verified Complaint also shows Defendants' "breach without legal justification" of the Non-Compete Provision of the Franchise Agreements. *Id.* (third element).

Specifically, the Non-Compete Provision plainly and unambiguously forbids the franchisee, during the term of the Agreements, to "engage in any activity in competition with the System, including, but not limited to, involvement, whether as an owner, officer, director, employee, lender, or otherwise, of any business engaged in the sale of calzones, pizza, or any business that customarily has operating hours past midnight and offers delivery services (collectively, a "Competing Restaurant"), other than at the Restaurant." Filing 1-1 at 13 (§ 14.A.i.a.); *see Convenient Food Mart, Inc.*, 1996 WL 635848, at *3 (explaining that contracts are interpreted according to their plain meaning). Yet, the Facebook evidence presented in the Verified Complaint shows that Defendants, the former owners, operators, and guarantors of the franchise, are now operating a business engaged in the sale of calzones, that the business customarily has operating hours past midnight, and that it provides delivery services. *See* Filing 1

15

at 9–13 (¶ 63) (Facebook screen shots advertising and showing calzones, "city wide delivery," and that "we deliver insanely late!").

The non-compete provision also plainly and unambiguously prohibits Defendants for a period of three years following termination "regardless of cause" of the termination to "engage in the operation of a Competing Restaurant within sixty (60) miles of (a) the Restaurant . . . or . . . any College or University with an undergraduate population of eight thousand (8,000) students or more." Filing 1-1 at 13 (§ 14.A.ii). Yet, the Verified Complaint shows that Defendants are operating a competing restaurant not just within 60 miles of the franchised restaurant but at the very same location. *See* Filing 1 at 9 (¶ 62). Moreover, they are doing so in Lincoln, Nebraska, where the University of Nebraska at Lincoln has an undergraduate population in excess of 8,000 students. Filing 1 at 6 (¶ 38). It is true that Ohio law requires that "an employer who seeks an injunction to enforce a noncompete clause must . . . establish the reasonableness of the noncompete clause at issue" as well as "that the employer is likely to suffer irreparable harm as a result of the employee's breach of that clause." *Gimex Props. Corp.*, 2022Ohio-4771, ¶ 63, 205 N.E.3d at 15 (quoting *Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640, 646, 752 N.E.2d 994 (10th Dist.2001)). The Court finds nothing so glaringly unreasonable on the face of the Verified Complaint and the Non-Compete Provisions of the Franchise Agreements as to render them "unreasonable," although a more complete record may ultimately demonstrate otherwise.Thus, Calzone King has a "fair chance"—and in this Court's view a "greater than fifty percent" chance—that it will ultimately prevail under applicable law on its claim of breach of the Non-Compete Provision of the Franchise Agreement. *Cigna Corp.*, 103 F.4th at 1343. This first *Winter/Dataphase* factor weighs heavily in favor of the issuance of the TRO to restrain breach of the Non-Compete Provision of the Franchise Agreement.

16

*4. Calzone King Is also Likely to Succeed on Its Unfair Competition Claim*

The Court will also consider Calzone King's likelihood of success on its unfair competition claim. Unlike Calzone King's claims of violations of the Non-Compete Provisions in the Franchise Agreements, Calzone King's "unfair competition" claim is governed by federal law, specifically, the Lanham Act. "Section 43(a) of the Lanham Act imposes liability on '[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of goods, services, or commercial activities.'" *Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 470 (8th Cir. 2011) (quoting 15 U.S.C. § 1125(a)(1)(A) in a case involving a service mark). The Lanham Act defines "use in commerce" as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce. . . .

15 U.S.C. § 1127(2). The Eighth Circuit Court of Appeals has explained, "Our cases interpreting the Lanham Act state that actual confusion is a prerequisite of monetary damages and likelihood of confusion a prerequisite to injunctive relief." *Masters*, 631 F.3d at 472 (citing cases); *id.* at 472–73 (explaining that "actual confusion" is not required by the statute as a prerequisite to monetary damages).

Here, the Verified Complaint shows that Defendants are using the D.P. Dough service mark after termination of their license "in commerce." 15 U.S.C. § 1127(2) (defining "in commerce"); 15 U.S.C. § 1125(a) (prohibiting improper use of a service mark "in commerce"). The D.P. Dough mark is "used or displayed in the sale or advertising of services" because the mark is displayed in the sale or advertising of Misfits on O's delivery service. *See* Filing 1 at 15 (¶ 65); *see* 15 U.S.C.

17

§ 1127(2). The Verified Complaint shows—and the Court finds—that the Misfits on O Facebook page has more than 2,000 followers and so its Facebook posts are likely to cause consumer confusion that Misfits on O is associated with D.P. Dough. Filing 1 at 15 (¶ 66); 15 U.S.C. § 1125(a) (prohibiting such use causing consumer confusion).

Thus, Calzone King has a "fair chance"—and in this Court's view a "greater than fifty percent" chance—that it will ultimately prevail under applicable law on its unfair competition claim involving the D.P. Dough service mark. *Cigna Corp.*, 103 F.4th at 1343. This first *Winter/Dataphase* factor weighs heavily in favor of the issuance of the TRO to restrain unfair competition in violation of the Lanham Act.

### C. The Threat of Irreparable Harm

As the Eighth Circuit Court of Appeals has explained, "The second *Winter/Dataphase* factor is the likelihood that a movant will suffer irreparable harm if the court does not grant a preliminary injunction." *Cigna Corp.*, 103 F.4th at 1345 (citing *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114). The Court turns to consideration of this factor starting with a summary of Calzone King's arguments.

#### 1. *Calzone King's Argument*

Calzone King argues Defendants' breach of their non-compete obligations and their use of the D.P. Dough service mark establish the threat of immediate and irreparable harm to Calzone King. Filing 5 at 5. Indeed, they assert that the mere violation of a valid non-compete agreement can support an inference of the existence of a threat of irreparable harm. Filing 5 at 5. Thus, Calzone King argues, Defendants' operation of a competing restaurant at the same location as the franchised restaurant in "flagrant violation" of the Non-Compete Provision is sufficient to show Calzone King will suffer immediate and irreparable injury. Filing 5 at 7. Also, Calzone King argues

18

that customers who previously purchased D.P. Dough calzones from the same location owned by the same proprietors and using the same business model are likely to be confused as to whether the calzones they purchased are D.P. Dough calzones. Filing 5 at 7–8.

### 2. Requirements to Show Irreparable Harm

The "irreparable harm" factor, like likelihood of success, is a very significant factor in the analysis. Indeed, "[t]he failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). As to the meaning of this factor,

> "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The mere "possibility of irreparable harm" will not suffice. *Winter*, 555 U.S. at 22, 129 S.Ct. 365. "To demonstrate irreparable harm, [the movant] must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023) (internal quotation marks omitted).

*Cigna Corp.*, 103 F.4th at 1346.[4]

### 3. Calzone King Has Shown Irreparable Harm

In the context of unlicensed use of a service mark or trademark in violation of 15 U.S.C. § 1125(a), the Eighth Circuit Court of Appeals has explained that "a finding that likelihood of confusion exists results in a presumption that a threat of irreparable harm exists." *Warner Bros. Ent. v. X One X Prods.*, 840 F.3d 971, 982 (8th Cir. 2016); *The Maids Int'l, Inc. v. Maids on Call*,

---

[4] "[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and 'is a sufficient ground to deny a preliminary injunction.'" *Ng*, 64 F.4th at 997 (quoting *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019)). There is no reasonable inference of unreasonable delay, where Calzone King terminated the Franchise Agreements on August 9, 2024, and just over two weeks later filed suit and sought a TRO against the violations of the non-compete agreement. Filing 1 at 8 (¶ 54); *see also* Filing 1-4 (Termination Notice).

*LLC*, No. 8:17CV208, 2017 WL 4277146, at *8 (D. Neb. Sept. 25, 2017) ("TMI established irreparable harm on its trademark infringement claims by showing likelihood of success on the merits."). The Verified Complaint shows—and the Court finds—that the Misfits on O Facebook page, on which it continues to display the D.P. Dough service mark, has more than 2,000 followers so that the Facebook posts are likely to cause consumer confusion that Misfits on O is associated with D.P. Dough because of the unlicensed appearance of the D.P. Dough mark, Filing 1 at 15 (¶ 66), meaning that Calzone King is likely to succeed on its service mark infringement claim. *Warner Bros.*, 840 F.3d at 982.

The question of irreparable harm from violation of non-compete provisions of a franchise agreement is more difficult. Under Ohio law, actual injury from violation of a non-compete agreement is not presumed but must be proved. *TGR Ents., Inc. v. Kozhev*, 2006-Ohio-2915, ¶ 36, 167 Ohio App. 3d 29, 38, 853 N.E.2d 739, 746. Nevertheless, the United States District Court for the Southern District of Ohio observed that while a plaintiff had not adequately shown that defendants merely competing with it in violation of a non-compete agreement would cause irreparable harm, it had adequately shown irreparable harm:

> [A] violation of the noncompete agreement is likely to cause irreparable harm to the extent that it risks the diversion of [plaintiff's] customers. Customers, once diverted from [plaintiff] may never return even if [plaintiff] eventually prevails in this case. Lost profits can be hard to calculate due to their speculative nature. Likewise, it would be difficult to calculate the loss of goodwill that [plaintiff] would suffer by having its clients wrongfully solicited by former employees.

*Total Quality Logistics, LLC v. Klompstra*, No. 1:22-CV-710, 2022 WL 19385986, at *4 (S.D. Ohio Dec. 22, 2022). Similarly, in an unpublished decision applying Ohio law, the Sixth Circuit suggested that if a non-compete agreement is reasonable, then so is a district court's preliminary injunction. *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 125 (6th Cir. 2019) ("For

the same reasons that Handel's non-compete covenant is reasonable, so too is the district court's preliminary injunction."). Again, there is nothing on the face of the Non-Compete Provision at issue here that suggests that it is unreasonable. More specifically, as to irreparable harm, the Sixth Circuit agreed with the district court that "the opening of [the competing business] created a strong risk of market confusion, along with the loss of fair competition and customer goodwill from existing and prospective customers." *Id.*

Even so, the Eighth Circuit Court of Appeals recognized that outcomes in litigation of preliminary injunctions in franchise cases have produced mixed results:

> A franchisee may persuade the court to grant preliminary relief if termination threatens the total destruction of an established business. On the other hand, the franchisor is often—but not always—granted a preliminary injunction if the franchisee has terminated the agreement and . . . is violating a post-termination covenant not to compete by soliciting former customers to abandon established loyalties. See a lengthy review of these authorities in 3 W. Michael Garner, Franch Distrib Law & Prac §§ 17.40–17.41 (2013). Surveying cases where franchisors sought preliminary injunctive relief, the author commented, "Courts have reached very different conclusions about irreparable injury on very similar facts." *Id.* at § 17.41, p. 284.

*H & R Block Tax Servs. LLC v. Acevedo-Lopez*, 742 F.3d 1074, 1077 (8th Cir. 2014). Consequently, the Eighth Circuit cautioned, "In these kinds of cases, where the competing equities are seldom obvious and many factors bear on this discretionary decision, particularized findings and reasons are needed for meaningful appellate review." *Id.* at 1078.

Nevertheless, in two relatively recent cases, judges of this District have found irreparable harm in the violation of non-compete provisions in franchise agreements. In a case involving a franchise of "a business format system for providing in-home care for elderly or infirm individuals under its name and trademarks," the district judge granted a preliminary injunction. *Right at Home,*

*LLC v. Gaudet*, No. 8:20CV462, 2021 WL 308237, at *1 (D. Neb. Jan. 29, 2021). As to irreparable

harm, the district judge explained,

> An award of money damages for breach of contract will not compensate Right at Home for the damage to its reputation and loss of goodwill caused by the defendants' conduct. Damages to reputation and goodwill are not quantifiable. Right at Home has shown an injury to its protectible franchise interest that defies calculation. Right at Home has shown that it will have difficulty recruiting another franchisee for the territory as long as the former franchisee operates a business in violation of the noncompete clause using the training, practices, and policies developed and provided by Right at Home. Also, Right at Home will suffer injury to its business reputation and its ability to manage franchises if it is perceived as tolerating the defendant's conduct.

*Right at Home, LLC*, 2021 WL 308237, at *8.

An earlier case involved a "franchise system that provides professional household

maintenance and cleaning services to residential properties in the United States and Canada." *The*

*Maids Int'l, Inc. v. Maids on Call, LLC*, No. 8:17CV208, 2017 WL 4277146, at *1 (D. Neb. Sept.

25, 2017). The franchisor sought "an injunction based on three of its claims: trademark

infringement; breach of post-termination obligations; and violation of the non-compete and non-

solicitation requirements of the Franchise Agreements." *Id.* at *5. The district judge found

irreparable harm on the breach of non-compete provisions, as follows:

> In the context of a franchise agreement, several Courts have held that "harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found 'irreparable.'" *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989). For example, in *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 202 (D. Mass. 2016), the court, applying Massachusetts law, concluded that irreparable injury was shown because "[t]he existence of a competing small-group, women's fitness studio at the location of the former [franchisee's] studio will likely harm [the franchisor's] goodwill and impair its ability to establish another studio." Similarly, in *Jiffy Lube Int'l, Inc. v. Weiss Bros.*, 834 F. Supp. 683, 692–93 (D.N.J. 1993), the court found irreparable harm, explaining that "the good will of the franchisor would be harmed by the existence of a competing service center at the very site of the former Jiffy Lube center." *Id.* *See also Bad Ass Coffee Co. of Hawaii v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d

22

1237, 1249 (D. Utah 2009) ("[T]he majority of courts that have considered the question have concluded that franchising companies suffer irreparable harm when their former franchisees are allowed to ignore reasonable covenants not to compete."); *Quizno's Corp. v. Kampendahl*, No. 01 C 6433, 2002 WL 1012997, at *7 (N.D. Ill. May 20, 2002) (finding irreparable harm where violation of non-compete clause would result in lost sales, goodwill, and market presence the franchisor once had in the area, and would threaten the franchise system as a whole).

The factors establishing irreparable harm in other cases demonstrate threat of irreparable harm to TMI in this case. Two Sisters operates out of the same locations as the former The Maids franchises. Until the filing of this Motion, at least one of the locations continued to use the The Maids logo on signage outside the location. Timothy Scussel assured then-customers of his The Maids franchise that if they chose to continue with Two Sisters, most everything would remain the same. Thus, customers of the former The Maids franchise were not merely confused by the transition, but were expressly told, by Scussel, that they would benefit from a continuity of operations if they remained with Two Sisters. The result of these actions is not speculative. Defendants have admitted that several The Maids customers are now customers of Two Sisters. As a result of these actions, TMI has lost actual customers in the areas protected by the Franchise Agreements, and could irreparably lose market presence in the area. Accordingly, TMI has demonstrated the threat of irreparable harm.

*The Maids Int'l, Inc.*, 2017 WL 4277146, at *9.

Similarly, the Verified Complaint evidences the risk of irreparable harm to Calzone King from Defendants' violations of the Non-Compete Provisions. Damages to Calzone King's reputation and goodwill are "not quantifiable," and Calzone King has shown an injury to its protectible franchise interest that "defies calculation." *Right at Home, LLC*, 308237, at *8; *The Maids Int'l*, 2017 WL 4277146, at *9 ("[H]arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to found irreparable" (internal quotation marks and citation omitted)). As recognized in *The Maids International*, operating a competing business at the very site of the former D.P. Dough franchise will harm Calzone King's good will. 2017 WL 4277146, at *9; *see also* Filing 1 at 9 (¶ 62) (alleging that the competing business is operating at the same location as the D.P. Dough

franchise); Filing 1 at 18 (¶ 95) (alleging that Defendants' conduct is causing irreparable harm to Calzone King's goodwill and reputation and that it will continue to suffer damage from confusion of the public for which there is no remedy at law). As in *Right at Home*, it is evident that Calzone King will have difficulty recruiting another franchisee for the Lincoln territory as long as the former franchisee operates a business in violation of the Non-Compete Provision of the Lincoln Franchise Agreement using the training, practices, and policies developed and provided by Calzone King. 308237, at *8; *see also* Filing 1 at 15 (¶ 70) (alleging that Defendants are using the recipes they learned from the Calzone King System). Calzone King is also likely to suffer injury to its business reputation and its ability to manage its franchises if it is perceived as tolerating the Defendants' conduct. *Id.* The harms here are not merely speculative, it is more than likely that the competing business is now serving the same products to the same customers in Lincoln, meaning that Calzone King has lost actual customers in the area covered by the Lincoln Franchise Agreement, and it could irreparably lose market presence in that area. *The Maids Int'l*, 2017 WL 4277146, at *9.

Thus, the "irreparable harm" *Winter/Dataphase* factor also weighs heavily in favor of granting a TRO, at least as to certain conduct of Defendants in Lincoln, Nebraska.

### D.  Balance of Harms

The third *Winter* factor and the second *Dataphase* factor considers the "balance of equities" or the "balance of harms." *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. This factor requires the court to balance the harm to the movant against the injury that granting the injunction will inflict on other litigants in the case. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022); *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020). In other words, this factor asks whether "the balance of equities tips in [the movant's] favor." *Tumey*, 27

24

F.4th at 664 (internal quotation marks omitted). To prevail, the movant must show that "the balance of equities so favors [the movant] that justice requires the court to intervene to preserve the status quo until the merits are determined." *Sessler*, 990 F.3d at 1157 (quoting *Powell v. Noble*, 798 F.3d 690, 702–03 (8th Cir. 2015), in turn quoting *Dataphase*, 640 F.2d at 113).

Calzone King argues that its reputation and goodwill are harmed by Defendants' competition with Calzone King at the same site as the former franchised restaurant in Lincoln. Filing 5 at 9. Calzone King argues that, in contrast, Defendants will suffer no harm by complying with the Non-Competition Provisions in the Franchise Agreements that they voluntarily entered into. Filing 5 at 9. Indeed, Calzone King contends that Defendants cannot convincingly assert that causing their competing business to be shut down is a harm to them where that hardship results from their own breach of the Franchise Agreements. Filing 5 at 9.

The Eighth Circuit Court of Appeals has held that the balance of harms weighs in favor of the plaintiff where the injury to the defendant was "largely self-inflicted." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997 (8th Cir. 2011). Likewise, the United States District Court for the Southern District of Ohio has recognized that a party cannot complain of hardship caused by that party's own actions in breaching a non-compete agreement. *Total Quality Logistics, LLC*, 2019 WL 1300223, at *4; *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000) (explaining that any harm to the defendant from restraining his violation of non-compete provisions "would be as a direct result of his own actions" because the defendant "was aware of the restrictive covenants, yet he chose to [violate them]"); *see also The Maids Int'l, Inc. v. Maids on Call, LLC*, No. 8:17CV208, 2017 WL 4277146, at *10 (D. Neb. Sept. 25, 2017) ("Where a party brings harm upon itself by virtue of [its own] recalcitrant behavior, the [party opposing the injunction] can hardly claim to be harmed, since it brought any and all difficulties occasioned by

25

the issuance of an injunction upon itself." (internal quotation marks and citations omitted)). The Court concludes at least on the one-sided record now before it that the Verified Complaint points to substantial harm that Calzone King would suffer if no TRO were issued, while Defendants harm from restraining their conduct would be self-inflicted. Moreover, any harm to the Defendants will be lessened by the limitations that the Court will impose on the scope of a TRO, as explained in § II.F. below.

This *Winter/Dataphase* factor also weighs decidedly in favor of the issuance of a TRO.

### E. The Public Interest

The final factor under both *Winter* and *Dataphase* is whether a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. Calzone King argues that there is a general public interest in enforcing contracts, including non-complete agreements. Filing 5 at 16. This Court agrees that the public has an interest in enforcing contractual obligations including reasonable non-compete agreements. *Sleep No. Corp.*, 33 F.4th at 1019; *accord Cigna Corp.*, 103 F.4th at 1348 (citing the same public interest in enforcing reasonable contract provisions in a case involving a non-compete agreement). This final *Winter/Dataphase* factor also weighs in favor of the issuance of a TRO.

Because all of the *Winter/Dataphase* factors weigh in favor of issuance of a TRO, at least on this preliminary record, a TRO in some form will issue in this case.

### F. Scope of the Temporary Restraining Order

Because the Court concludes that a TRO should issue, the next question is the scope of the TRO. As to whom the Court can enjoin, the Court has the authority to grant a preliminary injunction not just against principal actors but also against officers, agents, servants, employees, and attorneys, as well as those persons or entities in active concert or participation with such

26

persons. *See* Fed. R. Civ. P. 65(d)(2); *see also Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). As to what can be enjoined, the Supreme Court has explained that the scope of a preliminary injunction is "often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam). "Part of our consideration is whether the injunctive relief is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Another concern is that the injunctive relief must be "workable." *Id.* (citing *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam)).

The Court concludes that the substantive terms of a TRO proposed by Calzone King are not all appropriate at this time, even though they are all in line with the scope of the Non-Compete Provisions in the Franchise Agreements. To put it another way, some are more burdensome than necessary to provide complete relief to Calzone King on its preliminary *ex parte* showing. . *Nebraska v. Biden*, 52 F.4th at 1048. The principal limitation that the Court finds is necessary, except as otherwise indicated, is that the *ex parte* TRO like the evidence in the Verified Complaint should be centered on Defendants' conduct in Lincoln.

Calzone King first requests a TRO stating the following:

> 1.     Defendants, and all persons or entities acting in concert with them, are prohibited from using D.P. Dough's service mark, and Defendants shall immediately remove the D.P. Dough service mark from the Misfits on O Facebook page.

Filing 1 at 1. The Court finds this requirement appropriate based on evidence that Defendants are still using the D.P. Dough service mark on the Facebook page for Misfits on O in Lincoln, Nebraska, in violation of § 1125(a). Filing 1 at 14–15 (¶ 65) (including a screen shot of photos

including the D.P. Dough service mark). This requirement is not unduly burdensome, *Nebraska v. Biden*, 52 F.4th at 1048, and in the Court's view should be entirely "workable." *Id.*

Next, Calzone King seeks a TRO stating the following:

> 2.    Defendants, and all persons or entities acting in concert with them, are restrained and enjoined from operating a competing business in violation of the non-compete, non-solicitation, and post-termination provisions, as stated in Section 14 of the applicable Franchise Agreements.

Filing 4 at 1 (¶ 2). Based on the Verified Complaint, the only place where Defendants are currently operating a competing business in violation of the Non-Compete Provision of a Franchise Agreement is in Lincoln, Nebraska. The Court also concludes that it is appropriate to limit the prohibited business to one offering or advertising calzones or pizza for sale. Filing 1-1 at 13 (identifying restaurants as competing if they offer such products). There are plainly many restaurants that do not sell calzones or pizza that already customarily have operating hours past midnight and that offer delivery services, so the Court finds a restriction based on a business's hours or delivery inappropriate at this time on the present record. Thus, this provision will be reformulated as follows: "Defendants, and all persons or entities acting in concert with them, are restrained and enjoined from operating a business in Lincoln, Nebraska, offering or advertising calzones or pizza."

Calzone King also requests that the TRO state the following:

> 3.    Defendants, and all persons or entities acting in concert with them, must comply with the obligations imposed upon termination or expiration of the Franchise Agreements, as stated in Section 14 of the Franchise Agreements.

Filing 4 at 1 (¶¶ 2–3). Although the Court found that enforcement of contracts is in the public interest, the Court is not convinced that at this time a relatively nebulous direction to comply with Section 14 of all the Franchise Agreements is appropriate without further evidence of violations

28

of Section 14 of the Lincoln Franchise Agreements where Defendants are operating a competing business or any evidence of violations of Section 14 of either the Kearney Franchise Agreement or the Manhattan Franchise Agreement where Defendants have apparently ceased operating entirely in Kearney and Manhattan. The Court will not include this provision.

Calzone King requests a TRO stating:

> 4.    Defendants, and all persons or entities acting in concert with them, are prohibited from offering or advertising calzones for sale at Misfits on O.

Filing 4 at 1 (¶ 4). This requirement is not unduly burdensome and is entirely workable, *Nebraska v. Biden*, 52 F.4th at 1048, as it addresses offering and advertising of one product at the competing Lincoln location where such conduct is occurring in clear violation of the Lincoln Franchise Agreement. Filing 1-1 at 13.

The next requested prohibition in the TRO is more problematic. Calzone King request that the TRO state:

> 5.    Defendants, and all persons or entities acting in concert with them, are prohibited from engaging in the operation of a Competing Restaurant, as that term is defined in the Franchise Agreements, within sixty (60) miles of (a) the Lincoln Restaurant, the Manhattan Restaurant, or the Kearney Restaurant; (b) any D.P. Dough Restaurant (including both D.P. Dough Restaurants that are currently open and any new D.P. Dough Restaurant that may open in the future, even if the opening of such D.P. Dough Restaurant is after Franchisee first opened a Competing Restaurant in the market); or (c) any College or University with an undergraduate population of eight thousand (8,000) students or more.

Filing 1 at 1–2 (¶ 5). Such a restriction on Defendants' conduct goes well beyond the equities presented in this case. *Trump*, 137 S. Ct. at 2087. The evidence from the Verified Complaint demonstrates only that Defendants are operating a competing restaurant in Lincoln, Nebraska. They are highly unlikely to begin competing operations in either Kearney, Nebraska, or Manhattan, Kansas, within the term of any TRO. Thus, the Court will not enjoin defendants in this

manner at this time. For similar reasons, the Court will not enjoin defendants at this time in the manner requested in paragraph 6 of the Motion for Temporary Restraining Order. *See* Filing 4 at 2 (¶ 6) (requesting that the TRO state, "Defendants, and all persons or entities acting in concert with them are prohibited from diverting or attempting to divert any business or customer from any D.P. Dough restaurant.").

Finally, Calzone King asks that the TRO state the following:

> 7.    Defendants, and all persons or entities acting in concert with them, are prohibited from employing or seeking to employ any person who, from August 9, 2023 through August 9, 2024, was employed by any D.P. Dough restaurant or with Calzone King.

*See* Filing 4 at 2 (¶ 7). Although this term is consistent with the Non-Compete Provisions of the Franchise Agreements, it goes beyond the equities presented in this case at this stage, *Trump*, 137 S. Ct. at 2087, and is unduly burdensome, *Nebraska v. Biden*, 52 F.4th at 1048. The Court will not restrain Defendants in this regard based upon the current record.

The TRO issued on the terms set out above shall expire fourteen days after it is issued, unless before that time the court for good cause extends it for a like period or the adverse parties consent to a longer extension. Fed. R. Civ. P. 65(b)(2).

### G. The Security Requirement

Turning to the bond requirement, Rule 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court reads this language to make the giving of security mandatory before a preliminary injunction can issue. Nevertheless, "[t]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on

appeal in the absence of an abuse of that discretion." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)).

Calzone King argues, "Because the TRO is of limited duration lasting only until a preliminary injunction hearing can be held, a minimal security of $5,000 in cash or bond should be set." Filing 5 at 19. The Court concludes that while the TRO will be of short duration, it could potentially become a much longer-lasting preliminary injunction warranting a more significant security in the first place rather than the possibility of an adjustment in the security later. While the Court has no information at this time about Defendants' potential financial consequences from shutting down their business, even for a short time, the Court finds the impact of wrongfully enjoining or restraining their business would be significant. This is so, because the restraint would occur at the beginning of the academic year and at the beginning of the football season at the University of Nebraska at Lincoln where University students are Defendants' target customers. Consequently, the Court will require security in the amount of $15,000 cash or bond for the TRO to issue.

### III. CONCLUSION

On the showings in the Verified Complaint and in the circumstances presented, the Court concludes that an *ex parte* Temporary Restraining Order on the terms set out in § II.F. should issue. Accordingly,

IT IS ORDERED that

1.    Plaintiff Calzone King's Motion for Temporary Restraining Order, Filing 4, is granted; and

2.      A Temporary Restraining Order on the terms stated above shall issue *ex parte* upon the giving of security of $15,000 in cash or bond.

Dated this 30th day of August, 2024.

BY THE COURT:

Brian C. Buescher
United States District Judge